Thank you, Your Honor. Good morning. May it please the court, Brian Ward on behalf of the government. I'd like to reserve three minutes for rebuttal. The healthcare proclamation at issue in this case is a straightforward effort by the president to ensure that individuals seeking to immigrate to the United States take some basic steps to plan for whatever reasonably foreseeable healthcare needs they might have when they first arrive in the United States. Whether that's through showing that they have the resources to pay for whatever reasonably foreseeable healthcare expenses they might have upon their arrival in the United States to the extent they have any at all, or by obtaining or showing an intent to obtain some basic health insurance when they first arrive. Now, the need for this type of planning has only become clearer over the past year because, as the president set out in the findings in the proclamation, even before the global pandemic, the costs of the uninsured and uncompensated care costs exceeded $35 billion a year. These are costs that place an extreme burden on our emergency rooms, our hospitals, our healthcare system as a whole, driving hospitals into insolvency, driving up premiums, extending the wait times for individuals that genuinely need emergency room care because people are using emergency rooms for non-emergency situations. And as the president set out in his findings in the proclamation, this circumstance is made worse by allowing thousands of individuals into the United States every year who have made no demonstration that they can afford expected healthcare costs when they arrive here because, as the president said, recent immigrants lack health insurance at a rate three times higher than that of the regular population. That's a statistic that plaintiffs don't dispute. It's a statistic that their own expert agrees with, that recent immigrants lack health insurance or health coverage at a very high rate. And so in order to address this specific program, the president entered a targeted proclamation. And despite his broad authority, both under Article II, his inherent authority to regulate entry into the United States, and the broad authority he has under 1182 to regulate entry into the United States of aliens from abroad, the district court entered a universal injunction that's now prevented this presidential proclamation from having any effect for over 10 months and did so based on a finding that plaintiffs are likely to succeed on a couple arguments, neither of which they can ultimately succeed on in this case. Do you concede that at least one plaintiff in this case has Article III standing? So in order to be able to have standing to raise a claim, the only type of claims that are permitted related to a determination of related to exclusion of aliens abroad is U.S. citizens. And so U.S. citizen, there are some U.S. citizen plaintiffs here and Supreme Court has said that there is a narrow, there is a narrow form of judicial review for constitutional claims. When a U.S. citizen can raise, can say that the exclusion of a family member burdens their own rights. It's a very limited claim under the line of cases in Mandel and Dinh. And so the U.S. citizen plaintiffs in this case would have standing to raise those types of claims the district court found plaintiffs were likely to succeed on. None of the claims that form the basis of the universal preliminary injunction here are those constitutional claims. They're solely two statutory claims. The claim that the proclamation wasn't issued under any properly delegated authority and the finding that plaintiffs are likely to succeed on an argument. Do you agree that the organization has standing under Haven's Realty? No, your honor, I don't believe the organization has standing either, because in order to establish standing, they would have to show some diversion of their resources from their normal activities. And so, well, haven't they said they've done that? They are expending resources, providing advice and counseling to clients to, in order to comply with the conditions of the proclamation. And that is causing a drain and a reallocation of resources from other things. Isn't that classically what Haven's Realty says provides organizational standing in their own right? Well, you need to show some actual diversion of resources. And so if you look at what they've alleged in the complaint, the organizational plaintiff says that their core mission is to provide counseling and guidance to individuals in Multnomah County on healthcare resources. So if they haven't alleged that they're changing what they're doing, they're still able to provide those services, just the legal background against which they're providing advice has changed. And so the government's position is that that's not a diversion outside of their core activities that's sufficient to establish standing. But even if they had standing, again, the Supreme Court has said that determinations related to visa issuance or denial abroad are the types of situations in which individuals cannot raise statutory claims. These are determinations that are entrusted to the political branches, to Congress and the president. And so while U.S. citizens are- The issue here isn't individual determinations. We're not being asked to review an individual visa determination. The question is whether or not the proclamation adds additional requirements that are not authorized by the statute that is invoked. Isn't that classically a claim that courts can address and without entrenching upon the discretionary questions of how authority would be exercised within what's granted by the statute? Respectfully, no, Your Honor. So the Supreme Court has said repeatedly that these decisions about exclusion of aliens abroad is entrusted to Congress and the president. So Congress could create a statute that said these types of determinations are reviewable, but it never has. It's never authorized any such sort of claim that allows- Where Congress says this class of aliens shall be admitted and the president has authority to add, but can't change that category. And then he issues a proclamation that changes the category. Is your position we can't review that claim that he violated the statutory restriction? Well, yes, Your Honor. So the Supreme Court has said that the only types of claims that are reviewable in this circumstance are constitutional claims. And as the Supreme Court said in Dalton v. Specter, that an argument like plaintiffs make here, that the president has exceeded his statutory authority or issued or taken an action that conflicts with other statutes is a quintessential statutory claim. It's not a constitutional claim. Counselor, is it your position then that an argument under the non-delegation doctrine is not a constitutional question? So the non-delegation doctrine might be a constitutional question. And you told us that was one of the two grounds that they had raised. That would be a constitutional question. Couldn't it be a Youngstown question? That would be a constitutional question, wouldn't it? Certainly. But the Supreme Court has been clear that the non-delegation doctrine arguments can't be raised in this circumstance. Right. But right now, I'll just say that. Judge Collins was asking about was standing. So if they've raised a constitutional question under non-delegation, you may win going away on non-delegation. But you're not going to win on standing. Yes, Your Honor. So if they could raise a non-delegation doctrine or some other constitutional claim here, then they would have standing to raise that argument. But there's no basis to show that they're likely to succeed on that argument. So as the Supreme Court, I think the Supreme Court's decision in Knopf addressed this squarely. Knopf was a case that addressed the predecessor statute to 1182. And what the Supreme Court said is that determinations about entry of aliens from abroad is not just a legislative power. It is also a power that's inherent in the executive's Article II power. It's related to his foreign affairs power and his power over employment. Judge Council, how does the government square its argument here with what the Supreme Court decided in Hawaii versus Trump? Because there were a lot of standing questions that were raised in the Court of Appeals and the district courts in that case. And the court seemed to blow through it pretty quickly. Yes, Your Honor. So I think that the way to read Hawaii is to say that the Supreme Court found it didn't need to address the reviewability and standing questions in that case because it reached the merits and found that ultimately plaintiff's claims failed on the merits for the same reason plaintiff's claims failed here. Do you agree that it's not a jurisdictional issue as the government conceded in Hawaii? Yes, Your Honor. It's not a jurisdictional issue. It's a reviewability issue that outside of constitutional claims, Congress hasn't provided any basis to review statutory claims. But even if plaintiffs could raise statutory claims, if they have standing, and if this court could reach the claims on the merit, there's no way to find that they're likely to succeed on the merits of their claims. For the first claim, the district court found they were likely to succeed on was that this proclamation wasn't issued under any properly delegated authority. And so the first part of that was a finding that the proclamation doesn't meet the textual limits of 1182. But what the Supreme Court said clearly in Hawaii was that there's only one requirement of 1182, the sole prerequisite to the president issuing a proclamation or an entry suspension under 1182 is that the president make a finding that the entry of the covered individuals would be detrimental to the interest. Supreme Court said explicitly that it's questionable whether the president has to explain those findings at all. That court shouldn't substitute their view of the likely effectiveness of the proclamation or the sufficiency of the findings for what the president said. That's precisely what the district court did here. The district court held that there was no harm to the government and the proclamation was unnecessary because it was unlikely to have its intended effect. That's exactly what the Supreme Court said that courts shouldn't do in evaluating these proclamations. It's up to, again, Congress and the president to make determinations related to aliens abroad. And even if the findings in a proclamation were reviewable, the Supreme Court in Hawaii cited approvingly past proclamations, such as the proclamation at issue in the sale case, which explained its findings in only five sentences, and a more recent proclamation from President Clinton that explained his findings in one sentence and cited those approvingly as examples of situations where the president just needs to make the finding. He doesn't need to support or set up the background for that finding. And so there's no basis to find, both because the Supreme Court said enough non-delegation concerns are not implicated in this circumstance where we're dealing with entry of aliens abroad, which is inherently executive to power as well. And there's no basis to find that plaintiffs are likely to succeed on the merits of an argument that this proclamation exceeds the president's authority. The other basis that the district court found plaintiffs were likely to succeed on the merits with other statutes, principally the inadmissibility ground for individuals that are likely to become a public charge. Now, the ruling on this ground fundamentally understands how the admissibility grounds work. So there's a range of inadmissibility grounds in the Immigration and Nationality Act. In order to be admissible to the United States, an alien has to satisfy all of them. So the Congress's enactment of a particular form of elation for one inadmissibility ground isn't a determination that that alien should be admitted to the United States. If they satisfy that, they have to satisfy a range of inadmissibility grounds. And included in that statute, 1182, which sets out the inadmissibility grounds, is 1182F, the provision under which the president issued this proclamation, in which the Congress plainly gave the president, what the Supreme Court said, sweeping authority to make determinations to suspend entry of other individuals who wouldn't be covered by the existing inadmissibility grounds. This is the whole point. But if the supposed entrant, the appliquee for the visa, fails the, I'll call it the proclamation, it's irrelevant, doesn't it? Well, the proclamation is applied separately from the public charge provision. So what do you mean by separately? Well, so consular officers... At a separate time, at a separate step in the proceeding, what do you mean by it's applied separately? They're both applied at the same time, but they're each in a separate analysis. So... But no, no, no, but wait a minute, wait a minute. But if the consular official finds that, no, I'm sorry, but you don't meet the 30-day medical insurance requirement, so I have to refuse your visa. But now I'm going to go review the rest of the public charge prescription. He's not going to do that. She's not going to do that, right? It makes the public charge test irrelevant, doesn't it? Uh, so I, I'm not, I don't know exactly what a consular officer would do in that circumstance, whether if they identify one ground that bars entry or bars the issue of the visa. Well, you just told me it's separate. Well, so they have to, so let's say, uh, an individual satisfies the requirements of the proclamation, they need to satisfy those requirements and the requirements of the public charge ground. So individuals could satisfy both, they could fail one or the other, but that's no different than any other, uh, uh, suspension of entry under 1182. So there's individuals who under the entry suspension at issue in Hawaii would be inadmissible, um, based on that suspension. And as a result, uh, the public charge provision would be irrelevant, might be irrelevant to the ultimate determination of their admissibility. Um, but the Supreme Court in Hawaii found no issue with that. There's, there's a range of inadmissibility grounds in addition to the public charge round and the way the INA works. If it says individuals need to satisfy all of those grounds of inadmissibility, as well as any additional, uh, uh, entry suspensions, the president has entered under his inherent authority or the authority given to him by Congress. Um, and as the Supreme Court said in Hawaii, that 1182 gives the president sweeping authority and it's up to him to make, uh, it exudes to him in deference in every clause to make a determination over whose entry to suspend, when to suspend it, for what reasons and for how long. And if, yeah, if the, if 1182 was read narrowly to apply to individuals who otherwise limited to situations where an individual would otherwise be inadmissible anyway, then it does nothing at all. Provision is designed to give the president broad discretion to determine whether individuals who would otherwise be admitted to the United States, who would otherwise be admissible, should nonetheless have their entry suspended because, uh, uh, a detriment to the, to the interests of the United States that the president is now. So there's... Counsel, the, the, the, the motions panel, uh, in a decision issued after the briefing was completed here, um, started with, uh, the question of, of the VAWA exception to the public charge. Can you address that please? Certainly, your honor. So the VAWA exception is simply a, a limitation or a care, uh, provision within the public charge ground. So it's, it's a limitation on how broadly the, the public charge ground applies, but it's not a standalone provision that applies to other grounds of inadmissibility. So again, if an individual seeking to come in on a visa was exempt from the public charge ground based on the VAWA provision, but some other ground of inadmissibility applied, uh, it would not matter that they were, they had satisfied or fall, fell under that VAWA provision, um, for purposes of determining whether they were admissible under the other ground of inadmissibility. And the same is, is true here. Nothing about the VAWA provision is an affirmative decision by Congress that individuals who fall under that provision must be admitted to the United States. It's just a determination that the public charge ground shouldn't apply to these individuals. It doesn't apply more broadly than that. And again, as the Supreme Court said in Hawaii, uh, courts should not look for implicit limits in other statutes on the president's authority under 1182. The court assumed that... Counselor, did the president, did the president refer to the public charge, um, criteria at any point in his proclamation? I'd have to double check your honor, but I don't believe so. But what the proclamation does say is that this ground, this suspension and how it's applied, is applied separately from all the other grounds of inadmissibility. So consular officers must still apply any other provisions that we normally apply. And then in addition to, and separate from those provisions, applies the provisions of this proclamation. And so, so essentially the, the district court found... I wanted to save some time for rebuttal. You have about two minutes left. Okay. I'll save that for rebuttal then. Thank you, your honor. All right. We'll hear now from Ms. Flint. Your honors, may it please the court. Casey Flint for the plaintiffs. The proclamation overrides particular provisions of legislation enacted by Congress and is therefore invalid. First, the proclamation overrides Congress's legislative judgment in the Affordable Care Act that in order to address the problem of uncompensated care costs, subsidized coverage shall be allowed, that's the statute's language, for recent lawful immigrants. The proclamation... I mean, that provision applies to people who managed to get here and are here. So, but the proclamation only applies to people who haven't gotten here yet. So how is there a conflict between those two? Because of how the proclamation works, it does not categorically bar immigrants from entering the United States. It conditions entry on immigrants demonstrating to a consular official that they will not use subsidized ACA coverage that Congress has legislated. Notably, what the president has approved in the proclamation is several forms of health coverage that Congress did not want. So, for example, although the proclamation declares not approved subsidized ACA coverage, it approves use of Medicare, which Congress has said is not available to immigrants. It approves short-term limited duration plans, other plans that Congress deemed not essential health benefits. You're not claiming the proclamation makes them eligible for Medicare when Congress has denied it? No, it couldn't. The president lacks that power. I don't see the conflict. I don't see how there's a relevant conflict in that. The proclamation restricts what immigrants do upon entry into the United States. It requires immigrants to demonstrate to the consular official's satisfaction that they will not use a particular form of insurance that Congress wanted to be available, that Congress statutorily provided for as part of the legislation. Does the proclamation address anything about what happens if somebody makes representations to the consular official, gets into the United States, and is found later to have used subsidized health insurance? The proclamation itself does not address that. Of course, an immigrant who falsely stated that they would use a different form of insurance would be committing fraud. The proclamation doesn't specifically address how they would be penalized, but it requires a demonstration, and presumably its validity does not rest on an assumption that immigrants will engage in fraud in responding to consular interviews. What is very clear from the way the proclamation is set up, it declares approved certain forms of insurance, including forms of insurance that Congress either disfavored or disallowed, and it declares not approved forms of insurance that Congress specifically provided for this population. Foreign nationals who are here in the country, asylees and other people, they can still get the insurance that the ACA provides. Is that correct? That's true. People lawfully present in the United States can obtain insurance under the ACA as provided for. The test under Youngstown for whether the president's actions are consistent with what Congress has provided for is whether the president is acting, whether his action is incompatible with the implied or expressed will of Congress. Well, it seems to me, you know, in Hawaii, in Trump versus Hawaii, the court noted that in our decision, that case is a court further reason that the proclamation conflicts with the INA's finely articulated regulatory scheme by addressing matters of immigration already passed upon by Congress, and then it reversed us for saying that, and it seems to me you're which is that, well, he's addressing issues that are covered tangentially in other provisions, and he's not allowed to do that. They said he can do that. With respect, your honor, I disagree. So in Hawaii, the issue was a statute that provided for non-discrimination on national origin basis in the issuance of visas, and the Hawaii court said this statute, which the proclamation, which does make decisions based on national origin, is about admissions. These two things are not incompatible, and on that basis, it okayed the proclamation. It also said that the proclamation in that case was consistent with general provisions related to national security and vetting because the proclamation worked alongside. It complemented those provisions. That's not true of this proclamation, both with respect to the Affordable Care Act and with respect to the public charge provision. With respect to the Affordable Care Act, Congress has legislated in the exact same sphere that the proclamation acts in, the sphere of what benefits should be available to recent lawful immigrants. The proclamation, that's exactly what it's about. It's what benefits recent lawful immigrants should have available, make available to themselves in their first year of presence in the United States, and the two are clearly incompatible. Another serious defect with the proclamation is that it regulates domestic healthcare policy. Now, this is clear from at least three different ways. First of all, the proclamation on its face is directed to a domestic issue, a domestic issue of uncompensated healthcare costs. That problem, the only problem that the proclamation purports to solve, is not one that stems from or is even affected by anything that's happening in any other country. This is in stark contrast with the proclamation in Hawaii, where the problem at issue was other countries' information-sharing practices. And actually, as shown in the amicus brief submitted by immigration law professors, that's true of every proclamation under 1182F until this one. Another critical feature of the proclamation that shows that it relates to domestic lawmaking rather than foreign affairs is that it imposes requirements on immigrants' conduct after they are in the United States. So where do you get the limitation that the power under 1182F can't take into account domestic policy considerations? I mean, it seems in tension with your argument that there's a conflict with the public charge provision, because obviously, Congress and the INA has taken into account what happens to people when they get here. And so I don't understand why the president can't do the same thing in a somewhat different way. The key feature of this proclamation, which distinguishes it from the long line of proclamations before it, is that it turns on what immigrants show to consular officials about what they will do after they arrive in the United States. It does not look at anything about the immigrants. Counselor, that's also true of the public charge criteria. They can take into account whether the consular officer believes that they will become a public charge once they are admitted into the United States. And it's a whole range of criteria that you're to take into account. The way that public charge is adjudicated, and one key difference between public charge and this, is that that is an immigrant-by-immigrant assessment as to what immigrants do, the state of immigrants before they arrive, their education and skills, their family status, their age, and their assets and resources before they're admitted into the United States. This proclamation doesn't ask about the conditions of an immigrant before they're admitted. It doesn't ask about their country. It asks, what will you do after you're in the United States? And if I don't like your answer, you will not be admitted. If I do like your answer, you will be admitted. By using the lever of entry, the proclamation regulates, has the effect of regulating what immigrants do after they're admitted to the United States. Even under the current public charge regime, couldn't a consular officer look at somebody and say, what kind of resources do you have? Because I'm concerned that if you come into the United States, that you have no resources and few job prospects. And therefore, not only will you be a drain on certain programs that will provide food and housing, but that you will also use our health care. Wouldn't that be a perfectly logical thing for a consular officer to do? I think Your Honor is asking about, is it proper to consider whether the harms of entry will be felt in the United States? I think that is what a question like that would go to, whether a consular official could say, I'm concerned that when you're here, you'll use health care or whatever. And it is proper to consider harms. After all, Section 1182F is about the interests of the United States, and those interests will be felt domestically. But what's different is that the immigrant has to make representations about what they will do in the United States. And those representations are determinative. A different way of characterizing that, counsel, would be that the alien is being required to come forward and say, when we come into the United States, we will have sufficient resources. And we'll have sufficient resources not to become a public charge, and we will have sufficient resources to be able to account for our health care in case of any emergency that we have. What would be wrong with that? How are those things inconsistent? Well, let me answer that in two ways. First, with respect to the Affordable Care Act, the incompatibility there is that the immigrant has to say, I will not use coverage that Congress has said is available to me and that is a critical part of Congress's overall scheme for solving the uncompensated care cost problem. With respect to public charge, the reason there's an incompatibility there is the public charge statute, section 1184A4B, says that a consular official shall, at a minimum, consider five different factors. Now, if the consular official considered only resources, which I believe was your question, that would be inconsistent with the express directive of section 1182A4B. The statute is actually remarkably clear that the consular official shall, at a minimum, consider those five factors. The proclamation pulls a single factor out, the alien's resources, the resources that he or she has to pay for health care, whether that resource is one of the approved forms of insurance or adequate money to pay for foreseeable health care costs, and says this is the only thing to consider. That is directly contrary to the analysis prescribed expressly in A4B. Now, another reason why this proclamation focuses on domestic policy regulation, which makes it distinct from the Hawaii proclamation and every other proclamation before, is that it apparently affects a permanent change to what health care coverage is approved for immigrants in their first year in the United States. The problem is uncompensated care costs. Now, section 1182F permits suspension of immigration, suspension of entry, and Hawaii says that is a temporary limit. This proclamation gives no indication of how the problem, uncompensated care costs, could ever be resolved. Now, Hawaii says that the proclamation doesn't have to have a fixed end date, but it does have to be addressed to a problem that is susceptible to resolution such that the proclamation can be lifted. But this proclamation gives no metric. It gives no baseline for identifying how that problem could ever be resolved. So if we have a proclamation that is addressed to identifying and excluding terrorists, that has to have some provision where if we don't think terrorism is going to end anytime soon, there has to be a limit. I don't understand. You can't address problems that are continuing? Problems that are continuing can be addressed, but what Hawaii says is suspension does imply a temporary limit, and Hawaii says it has to be... Well, but it went off on the fact that there was a review, and there is a review here periodically to see whether there's a continued need and a need for modifications. Isn't that in the proclamation? Certainly there is, Your Honor. There is a review, but the problem is there's no indication of what one of those periodic reports on the proclamation could say that would indicate that the proclamation could be lifted. I mean, keep in mind what this proclamation is about. It's about uncompensated care costs. The finding points to immigrants who are uninsured, and the way it resolves that problem is barring the entry of immigrants who are uninsured. If the proclamation is ever lifted, that problem presumably will resume. There is no evident resolution that could lead the proclamation to be lifted. So that makes you question whether it is a suspension at all. Instead, what it does is permanently change what is approved insurance for immigrants after they enter the United States. Immigrants have to agree, have to demonstrate, have to represent that they will not use the comprehensive coverage, subsidized coverage that Congress intended for them. Now, when the president acts in a way that regulates internal or domestic affairs, as this proclamation does, he is strictly limited to using the powers that are enumerated in the Constitution. That's what Curtis Wright says. When federal power arose by taking power from the states when the Constitution was ratified. So when the federal government acts, it is strictly limited, acts internally, it is strictly limited to the powers that the Constitution specifies. That's not true about foreign affairs because there is inherent authority beyond, in the president's case, Article 2. But the president cannot enlarge his powers over internal affairs through the use of his authority as to external affairs. Justice Jackson said exactly that in Youngstown when he rejected an argument that the president could seize the steel mills because he needed them in support of his power as commuter to support the troops in Korea. Justice Jackson wrote, the president may not use this power to engage in foreign conflict to, quote, enlarge his mastery over the internal affairs of the country. That's exactly how this proclamation works. It uses power over entry in order to effect change in the domestic health care market. Would an alien violate the proclamation if the alien does show that within 30 days he or she will have the proper health insurance as specified here and then six months later goes on to the exchange and takes the subsidized and does in fact have such coverage within the 30 days. But then six months later goes on to the exchange and takes a subsidized policy. Would that alien have violated the proclamation in any way or be subject to sanction? No, I don't believe that would violate the proclamation. But the question, of course, isn't whether an alien violates the proclamation, but whether the president in putting in place the proclamation has acted in a manner incompatible with the expressed or implied will of Congress. And by directing immigrants, aliens to unsubsidized ACA plans and other forms of coverage that Congress, you know, does it regulate anything beyond the initial position of the alien? So at least at a coming in basis, here's where you need to be. What happens after? Does it address that? That's my question, because I think your domestic regulation argument depends on, you know, extending past that. And I'm not sure it does that. And that's what I'd like your help on. Well, with respect, your honor, I somewhat disagree. So you are absolutely right that the method of enforcement is allowing or denying entry. That is the sole method of enforcement for the proclamation. There is no, you know, regulatory force that comes in after. But the president uses this power, the power over entry, to achieve a goal that he could not achieve by acting with a different form of enforcement. Certainly, the president does not. Counsel, let's think about Youngstown. Let's suppose that President Truman said, you know, I don't think I can intervene in this labor dispute in Pennsylvania directly. So I'm going to enact steel tariffs. And I think that that will give the steel industry one up. And my hope is that by making foreign steel more expensive, that it'll increase demand and that will solve the labor problem. Now, can he do indirectly what he can't do directly by using his foreign affairs power? If I'm understanding the hypothetical, I believe the president can put in place tariffs. That, of course, has the, from the president's view, beneficial effect, hopefully, of resolving the labor crisis. But it does not compel any steel manufacturer or any striking labor union to reach a consensus. The president here says, I'm going to use my 1182-F authority that Congress has given me. It is broad. The Supreme Court has told me it's broad. And I am going to impose additional conditions on certain people who can come here. And it only applies at the border. So it doesn't apply to anybody who is lawfully in the United States. But it determines whether or not we're going to admit you. The difference is the condition, Your Honor. If the tariffs in the hypothetical were conditioned on failure to resolve the strike, that would be improper. Here, entry is conditioned on not taking congressionally approved benefits, on departing from the congressionally approved legislative scheme for health care. This proclamation is a straightforward rejection of Congress's solution to the very same problem, uncompensated care costs. It's actually a judgment that Congress's solution, subsidized ACA coverage, is part of the problem. It declares that immigrants who use subsidized ACA coverage are a financial burden on the United States and that their use of those benefits is detrimental to the interests of the United States. And that is directly contrary to what Congress legislated. Section 1182-F cannot be read to authorize this kind of domestic lawmaking. Congress cannot delegate to the president authority to make or amend or undercut laws based on his own unilateral interpretation of what domestic policy may be detrimental to the interests of the United States. That's not an intelligible principle for regulation of health insurance or for any other domestic matter. If Section 1182-F is read to grant the president broad authority only in the sphere of foreign relations, that's what the why versus Trump said, that's the sphere that every proclamation until this one has occupied, then there's not a non-delegation problem. The president does have inherent authority independently to determine what is in the interests of the United States with respect to foreign affairs, but not here. It is our view, your honor, your honors, that the proclamation should be, excuse me, that the preliminary injunction should be affirmed. Thank you. Thank you, counsel. And we'll hear now the follow-up argument from Mr. Ward. Thank you, your honor. Just a couple points on this Affordable Care Act argument. First of all, this is not an argument that plaintiffs made in their motion for a preliminary injunction. It's not a basis for the district court's preliminary injunction. The district court said explicitly that it wasn't going to address this argument. What's the answer to the question that I had about whether or not the proclamation reaches beyond the initial position of the alien upon arrival? Because it says that you have to have, that you will be covered by approved health insurance as defined in subsection B of the section within 30 days. So if you meet that criterion, and then six months later, you go on the exchanges and take a subsidized policy, have you, is there any issue with that? Is the fraud provision in 3C applicable to that? The proclamation does not bar that at all, your honor. So the proclamation assesses, it's aimed at this narrow gap in coverage that occurs at a high rate when individuals first arrive in the United States. But they can satisfy that by showing that they have the resources to pay for foreseeable medical care, not even obtain some other form of health care, as long as they can show they have the resources for that. And then shortly after they arrive in the United States, get the subsidized care under the ACA exchanges. So I think there's no conflict there. Also on this argument that the proclamation conflicts with domestic issues, I'd encourage the court to look at the proclamation that the Supreme Court addressed in the sale case. That proclamation was challenged on the basis that Congress had made particular asylum provisions available to individuals as soon as they stepped on our shore. And the Supreme Court said, that's fine. But the president has the authority to establish a naval blockade if he wants, and to bar, make the determination still under his inherent authority to control entry over who can step on our shore and access those provisions. So I have no conflict. And also note that that proclamation, that 1981 proclamation at issue and sale, addressed the findings in that proclamation, like many proclamations, related to a strain on law enforcement resources in communities in the southeastern United States, and threats to the welfare and safety of those communities inside the United States. So that 1182, which talks about a finding of detriment based on individuals who enter into the United States, there's no limit. In fact, 1182 explicitly contemplates that the findings will relate to harms in the United States. So for those reasons, we'd ask the court. Is there a question? No, I was just about to ask you to wrap up. Thank you, Your Honor. If there are no further questions, we'd ask the court to overturn the preliminary injunction. All right. Thank you. The case just started. It's time to thank both counsel for your excellent, very helpful arguments this morning. And that completes our calendar for this morning. In the case, the court will now be in recess.
judges: Tashima, Bybee, Collins